# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF GEORGIA
### SAVANNAH DIVISION

| | |
|---|---|
| EQUAL EMPLOYMENT OPPORTUNITY COMMISSION, | |
| Plaintiff, | CIVIL ACTION NO.: 4:20-cv-112 |
| v. | |
| ST. JOSEPH'S/CANDLER HEALTH SYSTEM, INC., | |
| Defendant. | |

## **O R D E R**

This action arises out of the disability-based discrimination Corey McKever allegedly suffered during the hiring process for a security officer position with Defendant St. Joseph's/Candler Health System, Inc. (the "Hospital"). (Doc. 1.) Plaintiff Equal Employment Opportunity Commission ("EEOC") sued Defendant for allegedly violating the Americans with Disabilities Act of 1990, 42 U.S.C. § 12101 et seq. ("ADA"), and Title I of the Civil Rights Act of 1991. (Id. at p. 1.) Specifically, Plaintiff alleges that Defendant intentionally discriminated against McKever based on a disability when Defendant rescinded a job offer as a security officer due to McKever's HIV-positive status. (See id.) Presently before the Court are Plaintiff's Motion for Partial Summary Judgment, (doc. 37), and Defendant's Motion for Summary Judgment, (doc. 46). The motions are fully briefed. (Docs. 37-1, 47, 53, 55, 60, 63.) For the following reasons, the Court **DENIES** Defendant's Motion for Summary Judgment, (doc. 46), and **GRANTS in part** and **DENIES in part** Plaintiff's Motion for Partial Summary Judgment, (doc. 37).

# BACKGROUND

I.    **Factual Background**

   A.    **McKever's Disability**

Corey McKever suffers from HIV (human immunodeficiency virus), a virus that "attacks the affected person's immune system." (Doc. 55-1, p. 4); see About HIV, CDC, https://www.cdc.gov/hiv/basics/whatishiv.html (last visited Feb. 15, 2022).[1]   If HIV is left untreated, it can lead to AIDS (acquired immunodeficiency syndrome).  See About HIV, CDC, https://www.cdc.gov/hiv/basics/whatishiv.html (last visited Feb. 15, 2022).   HIV is currently uncurable.  Id.  However, "with proper medical care, HIV can be controlled," and individuals with HIV "who get effective HIV treatment can live long, healthy lives."  Id.  Furthermore, HIV is transmitted through sexual contact or "blood-to-blood transmission." (Doc. 41, p. 50.)  Blood-to-blood transmission occurs "when there's blood from one person mixing with the blood of another person."   (Id.);   see   also   generally   HIV   Risk   Behaviors,   CDC, https://www.cdc.gov/hiv/risk/estimates/riskbehaviors.html (last visited Feb. 15, 2022) (listing the

---

[1]  Pursuant to Federal Rule of Evidence 201(b), the Court takes judicial notice of certain information about HIV taken from the CDC's website.  To the extent the Hospital argues that the Court cannot take judicial notice of information from the CDC's website, (doc. 55, p. 10), the Court notes that "courts have often taken judicial notice of information found on government agency websites."  Loucka v. Lincoln Nat'l Life Ins. Co., 334 F. Supp. 3d 1, 8 (D.D.C. 2018) (citing Cannon v. District of Columbia, 717 F.3d 200, 202 n.2 (D.C. Cir. 2013); Hawk v. Aircargo, Inc. v. Chao, 418 F.3d 453, 457 (5th Cir. 2005)); see also, e.g., Gent v. CUNA Mut. Ins. Soc'y, 611 F.3d 79, 84 n.5 (1st Cir. 2010) (taking judicial notice of information on the CDC's website regarding Lyme disease, such as causes and symptoms); Middleton v. Andino, 488 F. Supp. 3d 261, 267 n.3 (D.S.C. 2020) (taking judicial notices of facts and statistics from the CDC's website, the South Carolina Department of Health and Environmental Control's website, and the South Carolina Election Commission's website); Glenn v. B & R Plastics, Inc., 326 F. Supp. 3d 1044, 1068 n.7 (D. Idaho 2018) (collecting cases).  To the extent that the Hospital contends that the information from the CDC's website constitutes inadmissible hearsay, (doc. 55, p. 9), the Court finds that it is admissible under the public records exception to the hearsay rule under Federal Rule of Evidence 803(8).  See, e.g., United States v. Iverson, 818 F.3d 1015, 1021–22 (10th Cir. 2016) (finding that the public-records exception applied to information from the FDIC's website).  Notably, the Hospital does not dispute the authenticity of the CDC website.  (See doc. 55.)

estimated per-act probability of acquiring HIV from an infected source "by exposure act").  The probability of HIV transmission depends on the infected individual's viral load.  See <u>Factors That Increase HIV Risk</u>, CDC, <u>https://www.cdc.gov/hiv/basics/hiv-transmission/increase-hiv-risk.html</u> (last visited February 15, 2022).  "Viral load" is the "amount of HIV in the blood of someone who has HIV."  <u>Id.</u>  "The higher someone's viral load, the more likely that person is to transmit HIV." <u>Id.</u>  If an infected individual maintains an "undetectable viral load," then that individual is less likely to transmit HIV to others.  <u>Id.</u>

McKever was first diagnosed with HIV in December 2014 and has been receiving treatment since that time.  (Doc. 55-1, p. 4.)  To manage his HIV, McKever takes Genvoya, an antiretroviral therapy medication.  (<u>Id.</u>)  McKever stated that he requires "regular medical care" to manage his HIV, including a strict medication regiment, attending medical appointments, and testing his viral load twice per year.  (Doc. 37-5, pp. 1–2.)  McKever has always been compliant with his medication regimen.  (<u>Id.</u>)  Furthermore, from at least October 2015 through September 2018, McKever tested his viral load at least twice per year and received "undetectable" results each time.  (Doc. 55-1, p. 5.)

**B.     Defendant Offers McKever Employment as a Safety Officer**

Defendant operates hospitals on two separate campuses in Savannah, Georgia: the St. Joseph's campus and the Candler campus.  (Doc. 55-1, p. 1.)  On August 4, 2018, McKever applied for a Safety Officer position with the Hospital.  (<u>Id.</u>)  Safety Officers' responsibilities include patrolling the Hospital's facilities, providing patient assistance when requested by medical staff, and responding to calls for vehicle assistance, domestic or family disputes, psychiatric patient issues, and emergency room patients exhibiting violent tendencies.  (Doc. 48, p. 1; doc. 54, p. 1.) Safety Officers report, investigate, manage, and prevent safety and security hazards and participate

in first responder and emergency incidents.  (Doc. 48, p. 1; doc. 54, p. 1.)  Safety Officers are involved any time law enforcement brings in a patient and when a patient exhibits potential for violence, requires behavioral restraints, or is suicidal or homicidal.[2]  (Doc. 48, p. 1; doc. 54, p. 2.)

Robert Staples, the Hospital's Manager of Safety and Security, reviewed McKever's job application, interviewed him, and recommended that the Hospital hire him.  (Doc. 55-1, p. 3.)  Staples gave McKever the highest possible score in all categories on the applicant rating sheet.  (Id.)  On September 5, 2018, the Hospital gave McKever a conditional offer of employment as a Safety Officer, and McKever accepted.  (Id.)  While McKever's anticipated start date was September 17, 2018, he first had to clear a physical examination and process paperwork.  (Id. at p. 4.)  Specifically, like all potential Hospital employees, McKever underwent a post-offer occupational health screening through the Hospital's Occupational Health Services Department (the "OHS Department").  (Doc. 48, p. 3; doc. 54, p. 4.)  During a post-offer occupational health screening, the OHS Department assesses an applicant's ability to perform the essential job functions for the job for which the applicant has received a conditional offer.  (Doc. 48, p. 3; doc. 54, p. 4.)

Terri Elkins, an OHS Department nurse, conducted McKever's health screening.  (Doc. 48, p. 3; doc. 54, p. 4.)  During the screening, McKever informed Elkins that he is HIV-positive and stated that his viral load was "almost undetectable" and that he complied with his medication regimen.  (Doc. 48, pp. 3; doc. 54, pp. 4.)  Elkins then contacted Laura Floyd, the Manager of the

---

[2]  The job description for the Safety Officer position states that they are responsible for "safety and security duties," including detecting, correcting, reporting, investigating, managing, and preventing safety hazards and security violations.  (Doc. 53-8, pp. 1–2.)  The job description further states that Safety Officers inspect and operate security and safety systems, participate in emergency response situations as well as drills related to the "environment of care," and provide patients, visitors, and staff with escorts, transportation, and vehicle assistance.  (Id. at p. 2.)

OHS Department.  (Doc. 48, pp. 3–4; doc. 54, p. 4.)  Elkins expressed to Floyd her concerns about McKever's HIV positive status regarding his potential role as a Safety Officer and told Floyd that McKever represented that his viral load was "almost undetectable" and that he complied with his medication regimen.  (Doc. 48, p. 4; doc. 54, p. 5.)  Floyd then contacted Nancy Craig, the Manager of Infection Control at the Hospital.  (Doc. 48, p. 4; doc. 54, p. 5.)  Craig informed Floyd that there was a risk of HIV exposure and a lower risk of HIV transmission based on McKever's HIV-positive status.  (Doc. 48, p. 4; doc. 54, p. 5.)  Craig recommended to Floyd that she contact Dr. Ana Concepcion to obtain more information about McKever's recent lab work to determine the level of risk.[3]  (Doc. 48, p. 4; doc. 54, p. 5.)

Floyd then emailed Dr. Concepcion, Craig, and Emmitt Smith, an infection preventionist.  (Doc. 48, pp. 4–5; doc. 54, p. 5.)  In the email, Floyd explained that McKever is HIV-positive, that he takes Genvoya, that he reported that his viral load is "almost undetectable," and that he is otherwise in "excellent" health.  (Doc. 46-17, p. 2.)  Floyd also explained that Safety Officers are "often in physical altercations" and that the Hospital does not have any positions in "Safety/Security that don't involve the potential for . . . violent interaction."  (Id. (emphasis omitted).)  Floyd then asked, "Are we creating a safety risk/risk of exposure by placing [McKever] in this position knowing he will likely be called upon to physically restrain patients and intervene in violent situations."  (Id.)  Dr. Concepcion responded that HIV is transmitted through "blood or sexual contact" and that, "[i]n terms of blood transmission, usually a needle is required, to go from vein to vein, because the virus doesn't survive very well outside body."  (Doc. 46-19, p. 2.)  Dr. Concepcion further stated that "[i]ntact skin is a very effective protection" and that "[f]or skin to

---

[3] Dr. Concepcion is a medical doctor specialized in infectious diseases.  (Doc. 55-1, p. 8.)  She is employed at a private medical practice, serves as the chair of the Hospital's Infection Control Committee, and currently manages more than 100 patients diagnosed with HIV or AIDS.  (Doc. 48, p. 5; doc. 54, p. 6; doc. 55-1, p. 8.)

skin contact to be an issue, both parties would have to have open wounds, be bleeding, and touching each other, exchanging blood  . . . .  If the HIV person is undetectable the risk would be in the neighborhood of zero." (Id.)  Dr. Concepcion also stated that she would "like to know what almost undetectable means."  (Id.)  Floyd responded that she wanted to ensure that the OHS Department "is reasonable and accurate when estimating risk, if any, to patients or families" and that she "anticipate[d] receiving labs and notes from a recent visit" that would hopefully clarify what "almost undetectable" means.  (Id.; see also doc. 55-1, p. 11.)

Floyd received McKever's medical records on September 14, 2018, and subsequently reviewed them.  (Doc. 55-1, p. 11.)  The first set of medical records stemmed from a doctor's visit McKever had on June 19, 2018, approximately five weeks before he applied for the Safety Officer position.  (Id.)  These records indicated that McKever's January 19, 2018, viral load test result was in the "undetectable range." (Id. at p. 12.)  The second set of medical records indicated that a viral load test conducted on August 3, 2017, showed that McKever's viral load was in the undetectable range at that time as well.  (Id.)  Floyd and Elkins later met to review McKever's medical records and confirmed that McKever's labs showed an undetectable viral load.  (Id.)  However, Floyd did not follow up with or provide McKever's medical records to Dr. Concepcion.  (Id.)  Dr. Concepcion neither examined McKever nor reviewed his medical records.  (Id.)  Furthermore, Floyd did not request any other lab tests from McKever.  (Id. at p. 17.)

Floyd then reviewed several online sources, including healthline.com and the CDC's website.  (Doc. 48, p. 7; doc. 54, p. 8; see also doc. 46-22, pp. 2–9.)  The healthline.com source Floyd reviewed generally explains the connection between an individual's viral load and the risk of transmission.  (Doc. 46-22, pp. 2–7.)  Notably, the healthline.com source states that a "viral load test only represents a snapshot in time" and that people should "consider trends in test results rather

than only looking at individual test results." (Id. at p. 4.)  The website also states that HIV-positive individuals may experience "blips." (Id.)  According to healthline.com, blips are "temporary, oftentimes small increases in viral load." (Id.)  Healthline.com states that blips "may occur between tests, and there may be no symptoms." (Id. at p. 6.)  Finally, healthline.com states that antiretroviral therapy is medication "that helps to keep the viral load in the body under control." (Id.)  The website further states that "HIV treatment can substantially lower viral load levels, sometimes to undetectable levels." (Id.)

The CDC source Floyd considered states that "[t]aking HIV medication (called antiretroviral therapy or ART) as prescribed can make the viral load very low—so low that a test can't detect it (called an undetectable viral load)." (Id. at p. 8.)  The CDC source also states that "taking HIV medicine as prescribed will give [an HIV-positive individual] the greatest chance to get and keep an undetectable viral load." (Id.)  However, the CDC source further states that "[n]ot everyone taking HIV medicine has an undetectable viral load;" "[u]p to one-third of people in HIV care don't keep an undetectable viral load." (Id. (emphasis omitted).)  While the CDC website does not explain why one-third of people in HIV care fail to keep undetectable viral loads, it states that, "[t]o stay undetectable, people with HIV must take HIV medicine every day as prescribed." (Id.)  Based on her review of these online sources, Floyd concluded that transmission is not likely in an HIV-positive person with a low viral load but that viral loads can fluctuate without the knowledge of the HIV-positive individual.  (Doc. 48, p. 7; doc. 54, p. 8.)  Floyd conceded in her deposition testimony, however, that she did not have enough information to know whether McKever's viral loads were fluctuating and that she did not ask McKever to provide her with any additional lab tests.  (Doc. 40, pp. 115–116; see doc. 55-1, p. 17.)

Floyd then reviewed documentation of reported assault and restraining injuries sustained by Hospital workers, including those sustained by Safety Officers.[4]  (Doc. 48, p. 7; doc. 54, p. 9; doc. 55-1, p. 17; see also doc. 46-25.)  A chart titled "Reported Security Officer Assaults and Restraining Injuries" indicates that five injuries to Safety Officers occurred in 2018 due to assaults and restraining.  (Doc. 46-25, p. 4.)  However, the chart does not indicate if any of these incidents involved bleeding or the loss of blood by the Safety Officer.  (See id.)  Floyd also examined a log of all injuries sustained by Safety Officers from January 1, 2017, to September 10, 2018.  (Doc. 46-5, pp. 2–3; doc. 55-1, pp. 17–18.)  This log reveals twelve total injuries with three of those twelve involving bodily fluid (from scratches or a laceration) during the restraint of a patient. (Doc. 46-5, pp. 2–3.)  Based on her review of this documentation, Floyd concluded that violent altercations involving Safety Officers did occur and that any violent altercation could result in blood, bleeding, punches, cuts, and lacerations.  (Doc. 48, p. 8; doc. 54, p. 10.)  Floyd further concluded that McKever could transmit HIV if (1) he was involved in an altercation; (2) he was injured and bleeding; (3) the patient involved in the altercation had an open wound; and (4) McKever's blood went into the patient's open wound at a time when McKever's viral load was not undetectable.  (Doc. 48, p. 8; doc. 54, p. 11.)  Based on this, Floyd decided that there was a significant safety risk in employing McKever in the Safety Officer position.  (Doc. 48, p. 8; doc. 54, p. 11.)  Between September 14 and 24, 2018, Floyd decided to rescind McKever's job offer based on her belief that his medical condition created a significant safety risk to others in the workplace, specifically patients he may have to restrain or confront.  (Doc. 55-1, p. 23.)  In deciding to rescind McKever's job offer, Floyd claims she relied on: (1) McKever's medical records and viral load status; (2) her online research, including healthline.com and the CDC's

_____

[4]  The OHS Department collects all reports of injuries by employees and maintains logs of those injuries. (Doc. 55-1, pp. 17–18.)

website; (3) information about Safety Officer injuries; (4) the Safety Officer job description; (5) Dr. Concepcion's opinion in her single email; and (6) Craig's opinion.  (Id.)

### C.      Alternatives to the Safety Officer Position

After Floyd rescinded McKever's job offer, Floyd searched for other positions she believed that McKever could perform where there would be no risk of physical altercation.  (Doc. 48, p. 9; doc. 54, p. 12.)  Floyd identified several positions from the Hospital's "job board" and emailed the managers of those positions to notify them of McKever.  (Doc. 48, p. 9; doc. 54, p. 12; see also doc. 40, pp. 189–92.)  These alternative positions included positions in OR support tech, the laundry department, groundskeeping, transportation, and environmental services.  (Doc. 48, p. 10; doc. 54, p. 13; see also doc. 40, p. 193.)  McKever was interested in the positions in OR support tech, the laundry department, and groundskeeping, but the positions in the laundry department and groundskeeping were already filled.  (Doc. 48, p. 10; doc. 54, p. 13; see also doc. 40, pp. 186, 189, 192.)  McKever ultimately interviewed for and received an offer to work as an OR Support Tech, but he declined the offer because he did not have a vehicle, and the position required McKever to perform "on-call" hours.  (Doc. 48, p. 10; doc. 54, p. 13; see also doc. 46-11, p. 9.)  The only record evidence describing the job description of an OR Scrub Tech is from McKever, who stated that OR Support Techs clean up "blood and bones and stuff like that" in operating rooms and prep for surgery either the day of or the day before surgery.  (Doc. 46-11, p. 18.)  McKever also stated that he needed different training because he had never performed a role like the OR Tech Support position.  (Id.)

## II.     Procedural History

After McKever filed a Charge of Discrimination with the EEOC, the EEOC found reasonable cause to believe that the Hospital violated the ADA.  (See doc. 1, p. 3.)  On May 19,

2020, the EEOC filed a Complaint, (id.), and the Hospital subsequently filed an Answer, (doc. 5). The EEOC then filed a Motion for Partial Summary Judgment, (doc. 37), which the parties have fully briefed, (docs. 37-1, 55, 60).  The Hospital filed its own Motion for Summary Judgment, (doc. 46), which the parties have also fully briefed, (docs. 47, 53, 63).

## STANDARD OF REVIEW

Summary judgment "shall" be granted if "the movant shows that there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  A fact is "material" if it "might affect the outcome of the suit under the governing law." FindWhat Inv. Grp. v. FindWhat.com, 658 F.3d 1282, 1307 (11th Cir. 2011) (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986)).  A dispute is "genuine" if the "evidence is such that a reasonable jury could return a verdict for the nonmoving party." Id.

The moving party bears the burden of establishing that there is no genuine dispute as to any material fact and that it is entitled to judgment as a matter of law.  See Williamson Oil Co. v. Philip Morris USA, 346 F.3d 1287, 1298 (11th Cir. 2003).  Specifically, the moving party must identify the portions of the record which establish that there are no "genuine dispute[s] as to any material fact and the movant is entitled to judgment as a matter of law." Moton v. Cowart, 631 F.3d 1337, 1341 (11th Cir. 2011).  When the nonmoving party would have the burden of proof at trial, the moving party may discharge his burden by showing that the record lacks evidence to support the nonmoving party's case or that the nonmoving party would be unable to prove his case at trial.  See id. (citing Celotex Corp. v. Catrett, 477 U.S. 317, 322–23 (1986)).  If the moving party discharges this burden, the burden shifts to the nonmovant to go beyond the pleadings and present affirmative evidence to show that a genuine issue of fact does exist.  Anderson, 477 U.S. at 256–57.

In determining whether a summary judgment motion should be granted, a court must view the record and all reasonable inferences that can be drawn from the record in a light most favorable to the nonmoving party. Peek-A-Boo Lounge of Bradenton, Inc. v. Manatee Cnty., 630 F.3d 1346, 1353 (11th Cir. 2011) (citing Rodriguez v. Sec'y for Dep't of Corr., 508 F.3d 611, 616 (11th Cir. 2007)). Accordingly, in considering Plaintiff's motion for partial summary judgment, the Court will view the facts in the light most favorable to Defendant, and in considering Defendant's motion for summary judgment, the Court will view the facts in the light most favorable to Plaintiff. See Am. Bankers Ins. Grp. v. United States, 408 F.3d 1328, 1331 (11th Cir. 2005). However, "facts must be viewed in the light most favorable to the nonmoving party only if there is a 'genuine' dispute as to those facts." Scott v. Harris, 550 U.S. 372, 380 (2007). "[T]he mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." Id. (emphasis omitted). Nonetheless, "[c]ross-motions for summary judgment will not, in themselves, warrant the court in granting summary judgment unless one of the parties is entitled to judgment as a matter of law on facts that are not genuinely disputed." United States v. Oakley, 744 F.2d 1553, 1555 (11th Cir. 1984).

## DISCUSSION

In the Complaint, the EEOC alleges that the Hospital violated the ADA by discriminating against McKever due to his HIV positive status. (Doc. 1.) "The ADA was enacted to provide a clear and comprehensive national mandate to end discrimination against individuals with disabilities and to bring persons with disabilities into the economic and social mainstream of American life." Harrison v. Benchmark Elecs. Huntsville, Inc., 593 F.3d 1206, 1212 (11th Cir. 2010) (internal quotation omitted). As such, the ADA provides that "[n]o covered entity shall

discriminate against a qualified individual on the basis of disability in regard to job application procedures, the hiring . . . or discharge of employees, . . . and other terms, conditions, and privileges of employment."   42 U.S.C. § 12112(a); see 42 U.S.C. § 12111(2) (the term "covered entity" includes an employer or labor organization).   In order to proceed under the ADA, a plaintiff must show that (1) he had a disability; (2) he was a qualified individual; (3) the defendant took an adverse employment action against him; and (4) the defendant took that action because of the plaintiff's disability."   Leme v. S. Baptist Hosp. of Fla., Inc., 248 F. Supp. 3d 1319, 1338 (M.D. Fla. 2017) (citing Collado v. United Parcel Serv., Co., 419 F.3d 1143, 1152 n.5 (11th Cir. 2005)).

The Hospital argues that it is entitled to summary judgment because the EEOC cannot establish a prima facie case of disability discrimination.   (Doc. 47, pp. 11–25.)   Specifically, the Hospital argues: (1) McKever was not qualified to perform the Safety Officer position, (id. at pp. 12–19), and (2) McKever did not suffer an adverse employment action, (id. at pp. 19–22.).   The EEOC argues that it is entitled to summary judgment on the issues of (1) whether McKever is disabled, (2) whether McKever is a qualified individual under the ADA, (3) whether the Hospital rescinded McKever's job offer because of his disability, and (4) whether the Hospital based its decision to rescind McKever's job offer on "current objective medical evidence."   (Doc. 37-1, pp. 24–25.)

## I.   Whether McKever Had a Disability

The EEOC moves for summary judgment in its favor on the issue of whether McKever suffered from a disability under the ADA.   (Doc. 37-1, pp. 11–13.)   Specifically, the EEOC argues McKever's HIV-positive status qualifies as a disability under the ADA.   (Doc. 37-1, p. 11.)   The ADA defines a "disability" as: (1) "a physical or mental impairment that substantially limits one or more of the major life activities;" (2) "a record of such impairment;" or (3) "being regarded as

having such an impairment."  42 U.S.C. § 12102(1); 34 C.F.R. § 104.3(j)(1).  "A person who is infected with HIV is 'disabled' for purposes of the ADA, even if he has not developed AIDS." Doe v. Dekalb Cnty. Sch. Dist., 145 F.3d 1441, 1445 n.5 (11th Cir. 1998) (citing Bragdon v. Abbott, 524 U.S. 624 (1998)).  The Hospital concedes that McKever's HIV-positive status constitutes a disability under the ADA.  (Doc. 55, p. 12 n.4.)  Accordingly, the Court **GRANTS** Plaintiff's Motion for Partial Summary Judgment on this issue.  (Doc. 37.)

## II.  Whether McKever is a Qualified Individual under the ADA

Both parties move for summary judgment on the issue of whether McKever was a qualified individual under the ADA.  (Doc. 37-1, pp. 14–22; doc. 47, pp. 12–19.)  A qualified individual is one "who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual . . . desires."  42 U.S.C. § 12111(8).  "Determining whether an individual is 'qualified' for a job is a two-step process."  Reed v. Heil Co., 206 F.3d 1055, 1062 (11th Cir. 2000).  First, courts must ask whether the "individual satisf[ies] the prerequisites for the position."  Id.  That is, "does the individual have sufficient experience and skills, an adequate educational background, or the appropriate licenses for the job"?  Id.

Next, courts ask whether the "individual [can] perform the essential functions of the job, either with or without reasonable accommodation."  Id.  "An essential function of a job is a fundamental duty of the position that an individual with a disability is actually required to perform."  Agee v. Mercedes-Benz U.S. Int'l, Inc., 646 F. App'x 870, 874 (11th Cir. 2016) (citing Holly v. Clairson Indus., LLC, 492 F.3d 1247, 1257–58 (11th Cir. 2007)).  Furthermore, "[a] disabled individual cannot be qualified for a specific job if he poses a 'direct threat' to the health or safety of himself or others that cannot be eliminated by reasonable accommodations."  Nevitt v. U.S. Steel Corp., 18 F. Supp. 3d 1322, 1333 (N.D. Ala. 2014) (citing 42 U.S.C. § 12111(3));

Pinckney v. Potter, 186 F. App'x 919, 925 (11th Cir. 2006)).  The ADA defines a "direct threat" as a "significant risk to the health or safety of others that cannot be eliminated by reasonable accommodations."  42 U.S.C. § 12111(3); see also Bragdon, 524 U.S. at 649 ("Because few, if any, activities in life are risk free, . . . the ADA do[es] not ask whether a risk exists, but whether it is significant.").  An employer "must decide whether an employee poses a direct threat based on a reasonable medical judgment that relies on the most current medical knowledge and/or the best available objective evidence, and upon an expressly individualized assessment of the individual's present ability to safely perform the essential functions of the job."  Lisby v. Tarkett Ala., Inc., No. 3:16-cv-01835-MHH, 2010 WL 1536386, at *6 (N.D. Ala. Mar. 31, 2020) (internal quotations omitted); see 29 C.F.R. § 1630.2(r) ("The determination that an individual poses a 'direct threat' . . . shall be based on a reasonable medical judgment that relies on the most current medical knowledge and/or the best available objective evidence."); Bragdon, 524 U.S. at 649 ("The existence, or nonexistence, of a significant risk must be determined from the standpoint of the person who refuses the treatment or accommodation, and the risk assessment must be based on medical or other objective evidence.").  An employer's subjective, good faith belief that an applicant will pose a significant threat will not relieve the employer from liability.  Bragdon, 524 U.S. at 649.  Furthermore, under precedent established by the Eleventh Circuit Court of Appeals, the plaintiff "retains at all times the burden of persuading the jury . . . that he was not a direct threat."  LaChance v. Duffy's Draft House, Inc., 146 F.3d 832, 836 (11th Cir. 1998).

### A.    McKever satisfied the prerequisites for the Safety Officer position.

Regarding the first step in the Court's two-step analysis, the EEOC argues that it is entitled to summary judgment because the Hospital offered McKever the Safety Officer position.  (Doc. 37-1, p. 14.)  The Court agrees.  The record indicates that Staples interviewed McKever and

recommended that the Hospital hire McKever.  (Doc. 55-1, p. 3.)  Furthermore, Staples gave

McKever the highest possible score in all categories on the applicant rating sheet, and the Hospital

gave McKever a conditional offer of employment as a Safety Officer.  (Id.)  Thus, the Court finds

that McKever satisfied the prerequisites for the position.  Indeed, the Hospital admits as much.

(Doc. 63, p. 8 n.2.)  Accordingly, the Court **GRANTS** Plaintiff's Motion for Partial Summary

Judgment on this issue.  (Doc. 37.)

> **B.**     **A genuine dispute of material fact exists as to whether McKever could perform the essential functions of the Safety Officer position without posing a direct threat to others in the workplace.**

Concerning the second step in the analysis, the Court concludes that a genuine dispute of

material fact exists as to whether McKever could perform the essential functions of the Safety

Officer position without posing a direct threat to others in the workplace.  The Hospital argues

McKever's HIV-positive status rendered him a direct threat in the Safety Officer role because

responding to conflict situations or aggressive patients is an essential function of the job, and

McKever could have sustained injuries that caused him to bleed, potentially causing the

transmission of HIV to others.  (Doc. 47, pp. 7–8, 12–19; doc. 63, pp. 8–21.)  The EEOC does not

appear to contest that responding to conflict situations and aggressive patients is an essential

function of the Safety Officer position.  (See docs. 37-1, 53, 60.)  The EEOC does argue, however,

that it is entitled to summary judgment on the "direct threat" issue because McKever could perform

the Safety Officer job safely due to the risk of transmission being so low.  (Doc. 37-1, pp. 14–22.)

The EEOC further argues that Floyd failed to conduct an individualized assessment of McKever

based on reasoned medical judgment and the best objective evidence.  (Id. at pp. 21–22.)

To determine whether an individual would pose a direct threat, four factors must be

considered: "(1) [t]he duration of the risk; (2) [t]he nature and severity of the potential harm; (3)

[t]he likelihood that the potential harm will occur; and (4) [t]he imminence of the potential harm." 29 C.F.R. § 1630.2(r); see also Chevron U.S.A. Inc. v. Echazabal, 536 U.S. 73, 86 (2002) (quoting 29 C.F.R. 1630.2(r)); Doe v. Dekalb Cnty. Sch. Dist., 145 F.3d at 1446 (considering (1) "the nature of the risk (how the disease is transmitted)"; (2) "the duration of the risk (how long is the carrier infectious)"; (3) "the severity of the risk (what is the potential harm to third parties)"; and (4) "the probabilities the disease will be transmitted and will cause varying degrees of harm.") (quoting Sch. Bd. of Nassau Cnty. v. Arline, 480 U.S. 273, 288 (1987)).

The parties' dispute mostly centers on the third and fourth factors.[5]  (Doc. 47, pp. 7–8; doc. 53, pp. 12–19; doc. 63, pp. 15–21.)  Because the evidence regarding these factors is contradictory, the Court concludes that neither party is entitled to summary judgment.  First, a dispute of fact exists regarding the effectiveness of HIV medication like the one McKever takes.  The Hospital, relying on the CDC's guidance that "[u]p to one-third of people in HIV care don't keep an undetectable viral load," (doc. 46-22, p. 8), contends that HIV medication is not always effective.  (Doc. 63, pp. 16–17.)  However, the CDC also states that taking antiretroviral therapy (like the

---

[5]  The parties do not appear to strongly dispute the first two factors.  The duration of the risk posed by McKever's HIV-positive diagnosis is indefinite because there is presently no cure for HIV.  Indeed, Plaintiff concedes as much.  (Doc. 53, p. 13); see also Waddell v. Valley Forge Dental Assocs., 276 F.3d 1275, 1281 (11th Cir. 2001) ("As to . . . the duration of the risk, the court found that HIV infection is indefinite because there is no cure for HIV at this time.  . . .  [B]oth parties agree on this point.").  Furthermore, the parties appear to agree on the nature of the potential harm posed by HIV.  (Doc. 47, p. 5 ("HIV is transmitted through 'blood or sexual contact.'"); doc. 63, p. 16 ("HIV is transmitted through sexual contact or blood-to-blood transmission where the blood of the HIV-positive individual mixes with the blood of another.").)  Indeed, Dr. Concepcion testified that HIV is transmitted through sexual contact or "blood-to-blood transmission," (i.e., "when there's blood from one person mixing with the blood of another person").  (Doc. 41, p. 50.)  Additionally, concerning the severity of the potential harm of HIV transmission, the EEOC concedes that "HIV is a serious disease."  (Doc. 53, p. 13.)  Indeed, HIV is an incurable disease, and McKever stated himself that he requires "regular medical care" to manage his HIV, including a strict medication regimen, attending medical appointments, and testing his viral load twice per year.  (Doc. 37-5, pp. 1–2.)  The Court notes, however, that the CDC states that "with proper medical care, HIV can be controlled," and individuals suffering from HIV "who get effective HIV treatment can live long, healthy lives."  See About HIV, CDC, https://www.cdc.gov/hiv/basics/whatishiv.html (last visited Feb. 15, 2022).

medication McKever takes) "as prescribed can make the viral load very low—so low that a test can't detect it (called an undetectable viral load)."  (Doc. 46-22, p. 8.)  Moreover, the CDC states that "[a]s an HIV-positive person's viral load goes down, the chance of transmitting HIV can go down dramatically."  (Id.)  Furthermore, the CDC source Floyd relied on does not indicate whether or why a person who takes HIV medication—such as antiretroviral therapy—may experience detectable viral loads or if there is any reason why McKever would experience detectable viral loads.  (See doc. 46-22.)  Moreover, the parties agree that McKever has always been compliant with taking his antiretroviral therapy medication to control his HIV.  (Doc. 55-1, p. 4.)  Thus, there is a dispute of fact as to the effectiveness of antiretroviral therapy medication and whether McKever could experience detectable viral loads despite his strict adherence to his medication regimen.

Furthermore, a factual dispute exists as to the threat "blips" pose with McKever.  The record indicates that individuals diagnosed with HIV may experience "blips," or sudden increases in their viral loads, even if on medication.  (Doc. 46-22, pp. 4, 6, 8.)  However, nothing in the record indicates that McKever has ever experienced blips or that his viral load has reached detectable levels since being diagnosed with HIV.  Indeed, the parties agree that, since at least October 2015 to September 2018, McKever has tested his viral load twice a year and received a result indicating an undetectable viral load each time.  (Doc. 55-1, p. 5.)  Furthermore, Dr. Concepcion examined McKever's January 2018 viral load test during her deposition and concluded—as she had when she responded to Floyd's email—that the chances a person with such a test would transmit HIV to another was in the "neighborhood of zero."  (Doc. 41, pp. 66–69.)  While the Hospital argues that McKever could experience a blip at some point in the future like other HIV patients, a general belief that HIV patients, including McKever, could experience blips

in the future is insufficient to find as a matter of law that McKever posed a direct threat.  See Lisby,

2020 WL 1536386, at *6 ("[E]vidence contradicts Tarkett's argument that Mr. Lisby posed a direct

threat as a cycle counter.  Tarkett reached its decision based only on Dr. Daniel's opinion.  But Dr.

Daniel did not examine Mr. Lisby or investigate whether Mr. Lisby actually exhibited impairments

from taking methadone.  Instead, Dr. Daniel opined that Mr. Lisby was a safety risk because Dr.

Daniel generally considered all long-term opiate users to pose an increased risk of injury.").[6]

Finally, a dispute of fact exists as to whether Floyd conducted an "individualized

assessment" of McKever's "present ability to safely perform the essential functions of the" Safety

Officer job and made a "reasonable medical judgment" based on "the most current medical

knowledge and/or the best available objective evidence."  Lisby, 2010 WL 1536386, at *6.  In

deciding not to hire McKever, Floyd relied on: (1) McKever's medical records and viral load

---

[6] While the Hospital relies on Horton v. Hillshire Brands Co., No. 3:16-cv-00578-AKK, 2018 WL 1729038, at *11 (N.D. Ala. Apr. 10, 2018), for the proposition that the existence of a "theoretical possibility of transmission" can constitute a direct threat, (doc. 47, p. 17), the Court finds that case distinguishable from the facts here.  In Horton, the court determined that an employee's untreated hypertension, which could result in sudden and unpredictable strokes or heart attacks, posed a direct threat to others in the performance of a forklift operator position.  2018 WL 1729038, at *11.  The court in Horton considered the employee's argument that he had never experienced any stroke-like or heart attack symptoms in the past as uncompelling, in part, because medical professionals identified that the employee suffered from high blood pressure, the employee's own expert admitted that there was no way to predict if and when the employee would become symptomatic, and the medical evidence "provide[d] that a characteristic of [the employee's illness] [was] a lack of observable symptoms until the disease manifests itself through potential deadly effects including heart attack and stroke."  Id.  However, in this case, the Hospital fails to identify any medical expert who examined McKever that stated it was impossible to predict if and when McKever would experience "blips."  (See docs. 47, 63.)  Furthermore, while the Hospital contends that "there was no way for [it] to know on any given day whether McKever's viral load would be undetectable" because viral loads can fluctuate without warning, (doc. 63, pp. 18–19), the record citations the Hospital relies on for this assertion are less than clear on the effect blips have on HIV transmission.  For example, the CDC states that "[p]eople taking HIV medicine sometimes have small increases or 'blips' in their viral load," (doc. 46-22, p. 8 (emphasis added)), but the CDC does not explain if these blips result in detectable viral loads or viral loads that could cause transmission of HIV.  (See id.)  Furthermore, while the healthline.com article Floyd relied on states that "[s]ome people may experience . . . . temporary, oftentimes small increases in viral load," (id. at p. 4 (emphasis added)), the article also states that the fluctuation "isn't usually worrisome," and it does not explain whether these "small increases" raise the viral load to levels that could cause transmission.  (Id.)  Indeed, nothing in the record indicates that every HIV patient experiences blips or even how often blips occur.

status; (2) online sources, such as healthline.com and the CDC's website; (3) Staples' statement on the level of assaults and interactions the Safety Officers experienced; (4) the job description of the Safety Officer role; (5) charts of Safety Officer injuries; (6) Dr. Concepion's single email; and (7) Craig's opinion.  (Doc. 40, pp. 106–07; doc. 55-1, pp. 7, 9–14, 17–20, 23.)  Thus, Floyd relied on at least one source that was specific to McKever: his medical records.  While the fact that Floyd reviewed McKever's medical records would tend to support a finding that she conducted an "individualized assessment," this is undercut by the lack of evidence that Floyd asked any medical professional (such as Dr. Concepcion) to review Floyd's medical records and assess his risk of transmission prior to rendering her ultimate decision.  Likewise, while the fact that Floyd obtained an opinion from Dr. Concepcion via email after providing some general information about McKever's HIV status could support a determination that Floyd performed an individualized assessment, this is undercut by the fact that Dr. Concepcion had neither examined McKever nor reviewed his medical records in formulating the opinion contained in the email.  (See doc. 55-1, pp. 12–13.)  Thus, while Dr. Concepcion's email stated that "skin to skin contact [could] be an issue" if "both parties [had] opens wounds, [and were] bleeding[,] . . . touching each other[, and] exchanging blood," that opinion was based on HIV patients in general rather than an individualized assessment of McKever.  (Doc. 46-19, p. 2); see Lowe v. Ala. Power Co., 244 F.3d 1305, 1309 (11th Cir. 2001) (finding that "particularized facts using the best available objective evidence as required by the regulations" did not support that an employee posed a direct threat because the employer relied in part on a doctor's "assumption that all double amputees have the same limitations," the doctor did not assess the employee's "actual capabilities through a physical examination or functionality test," and conducted only a "cursory examination of the employee.") (internal quotations omitted).  Floyd also—despite her concern about the possibility of viral load

fluctuations—never asked McKever to provide any more recent lab test results, even though she admitted that she did not have enough information to know if McKever's viral loads ever fluctuated.  (Doc. 55-1, pp. 13, 17.)  Thus, her concern was based on her understanding of how viral loads fluctuate in all HIV-positive individuals rather than any individualized assessment of McKever or any trend in McKever's viral loads.  Furthermore, the online sources Floyd reviewed (healthline.com and the CDC's website) are neither individualized towards McKever nor clear as to how HIV medication impacts fluctuations (or blips) in viral loads.  (See doc. 46-22.)  Lastly, McKever's medical records examined by Floyd show that McKever's viral load was undetectable, and Dr. Concepion, after reviewing McKever's viral load tests during her deposition, testified that the risk of transmission for a person with such "undetectable" test results would be in the "neighborhood of zero."  (Doc. 41, pp. 66–69); see Lisby, 2020 WL 1536386, at *6 ("Dr. Daniel opined that Mr. Lisby was a safety risk because Dr. Daniel generally considered all long-term opiate users to pose an increased risk of injury.  So a reasonable jury could doubt that Tarkett relied on the best available objective evidence or an individualized assessment . . . .").

Based on the foregoing, the Court concludes that a question of material fact exists as to whether McKever posed a "significant risk to the health or safety" (and, thus, a direct threat) to others and thus whether he was a qualified individual under the ADA.[7]  Accordingly, neither the

---

[7]  The Hospital, relying on Waddell, argues that "[a] plaintiff can pose a direct threat to others even if the likelihood of transmission [is] low, as long as there is a sound, theoretical possibility of transmission and the severity of the risk is high."  (Doc. 63, p. 18 (citing Waddell, 276 F.3d at 1282).)  In Waddell, the Eleventh Circuit held that an HIV-positive dental hygienist posed a significant risk of HIV transmission to his patients even though risk of transmission was low.  276 F.3d at 1281–82.  In reaching this decision, the Eleventh Circuit stated that "when transmitting a disease [that] inevitably entails death, the evidence supports a finding of significant risk if it shows both (1) that a certain event can occur and (2) that according to reliable medical opinion the event can transmit the disease."  Id. (emphasis added) (internal quotations omitted) (quoting Onishea v. Hopper, 171 F.3d 1289, 1299 (11th Cir. 1999)).  The court reasoned that "when the adverse event is the contraction of a fatal disease, the risk of transmission can be significant even if the probability of transmission is low: death itself makes the risk significant."  Id. at 1281 (internal

Hospital nor the EEOC is entitled to summary judgment on this ground.  Thus, the Court **DENIES**

Plaintiff's Motion for Partial Summary Judgment, (doc. 37), and Defendant's Motion for Summary

Judgment, (doc. 46), on this issue.

### III.    Whether McKever Suffered an Adverse Employment Action

The Hospital further argues that, even assuming McKever was a qualified individual under

the ADA, it is entitled to summary judgment because McKever did not suffer an adverse

employment action.  (Doc. 47, pp. 19–22.)  Specifically, the Hospital argues that McKever did not

suffer an adverse employment action because it gave McKever the opportunity to apply for other

jobs at the Hospital and offered him a position as an OR Support Tech.  (Id.)  An adverse

employment action is one that "impact[s] the terms, conditions, or privileges of [a] plaintiff's job

in a real and demonstrable way." Davis v. Town of Lake Park, 245 F.3d 1232, 1239 (11th Cir.

2001) (internal quotations omitted), *overruled on other grounds by* Burlington N. & Santa Fe Ry.

Co. v. White, 548 U.S. 53, 54 (2006); see Lucas v. W.W. Grainger, Inc., 257 F.3d 1249, 1261

(11th Cir. 2001) ("An employment action is considered 'adverse' only if it results in some tangible,

negative effect on the plaintiff's employment.").  "[T]he asserted impact cannot be speculative and

must at least have a tangible adverse effect on the plaintiff's employment." Davis v. Town of Lake

Park, 245 F.3d at 1239.  "An ADA plaintiff must demonstrate that a reasonable person in his

_____

quotations omitted).  "Today, however, HIV does not invariably cause death." Henderson v. Thomas, 913
F. Supp. 2d 1267, 1290 (M.D. Ala. 2012); see also About HIV, CDC,
https://www.cdc.gov/hiv/basics/whatishiv.html (last visited Feb. 15, 2022).  Indeed, "[t]he vast majority of
infected individuals can expect to live a near normal lifespan." Henderson, 913 F. Supp. 2d at 1290.  As
the district court in Henderson stated, "It strains credulity to imagine that the Eleventh Circuit meant to
encompass in its rule all diseases that are fatal without the benefit of modern medicine." Id. at 1290 n.20.
Thus, the Court finds the Hospital's argument that any level of potential risk of HIV transmission renders
McKever a direct threat unpersuasive.  See id. ("[T]he heightened standard that the Eleventh Circuit applied
in Onishea for fatal illnesses no longer applies to HIV.").

position would view the employment action in question as adverse." Doe v. Dekalb Cnty. Sch. Dist., 145 F.3d at 1449.

As an initial matter, the Hospital does *not* contend that the revocation of McKever's conditional offer of employment for the Safety Officer position fails to constitute an adverse employment action, nor could it. (See doc. 47, pp. 19–22.) Courts have consistently held that failing to hire prospective employees and revoking conditional job offers are adverse employment actions. See, e.g., Schultz v. Royal Caribbean Cruises, Ltd., 465 F. Supp. 3d 1232, 1273 (S.D. Fla. 2020) ("Plaintiff has suffered an adverse employment action because, after Defendant's medical review, Defendant withdrew Mr. Schultz's employment offer. A reasonable person would perceive this withdrawal as an adverse employment action because it precludes future employment opportunities and performances onboard Defendant's vessels."); Lisby, 2020 WL 1536386, at *10 ("Mr. Lisby . . . suffered an adverse employment action when Tarkett revoked his conditional job offer."); Helmuth v. Troy Univ., No. 2:19-cv-601-RAH-SMD, 2021 WL 1081118, at *7 (M.D. Ala. Mar. 19, 2021) (collecting cases).

Instead, the Hospital attempts to equate the facts of this case with those of a "lateral transfer" case. (Doc. 47, pp. 19–22.) "The law is well established that the denial of a *purely* lateral transfer does not constitute an adverse employment action." Barnhart v. Wal-Mart Stores, Inc., No. 8:04-cv-2452-T-26EAJ, 2006 WL 8439915, at *4 (M.D. Fla. Mar. 3, 2006) (emphasis added) (citing Doe v. Dekalb Cnty. Sch. Dist., 145 F.3d at 1449). A "purely lateral transfer" is a transfer which "does not involve a demotion in form or substance." Doe v. Dekalb Cnty. Sch. Dist., 145 F.3d at 1449. Indeed, "[a] lateral transfer that does not result in 'lesser pay, responsibilities, or prestige' is not adverse." Barnhart v. Wal-Mart Stores, Inc., 206 F. App'x 890, 893 (11th Cir. 2006) (citing Doe v. Dekalb Cnty. Sch. Dist., 145 F.3d at 1448–49). Furthermore, a lateral transfer

is not adverse "simply because the plaintiff dislikes it or agrees with it."  See Double v. FedEx Ground Package Sys., Inc., 572 F. App'x 889, 895 (11th Cir. 2014) (citing Doe v. Dekalb Cnty. Sch. Dist., 145 F.3d at 1449).

Even assuming that the Hospital's offer of the OR Tech Support position constitutes "a transfer," the Court finds that this transfer was not a "lateral transfer" because the record indicates that OR support techs have significantly different responsibilities than Safety Officers.[8]  The job description for the Safety Officer position states that they are responsible for "safety and security duties," including detecting, correcting, reporting, investigating, managing, and preventing safety and security hazards.  (Doc. 53-8, pp. 1–2.)  The job description further states that Safety Officers inspect and operate security and safety systems, participate in emergency response situations as well as drills related to the "environment of care," and provide patients, visitors, and staff with escorts, transportation, and vehicle assistance.  (Id. at p. 2.)  In contrast, according to McKever's testimony, OR Support Techs clean up "blood and bones and stuff like that" in operating rooms and prep for surgery either the day of or the day before surgery.  (Doc. 46-11, p. 18.)  The differences between the two positions are further supported by McKever's testimony that he needed different training because he had never performed a role like the OR Tech Support position and that the OR Tech Support role required on-call hours.[9]  (Id. at pp. 8–9, 18.)

While the Hospital points out that "the OR Scrub Tech job and Safety/Security Officer job are both entry level positions with the opportunity for advancement," (doc. 47, p. 20), the Hospital

---

[8]  Floyd testified that she also informed McKever about a groundskeeper position and a position in the laundry department.  (Doc. 40, pp. 189–92.)  However, while those positions were listed on the Hospital's "job board", they were already filled.  (Id. at pp. 186, 189, 192–93.)  Furthermore, the OR Tech Support position is the only position (other than the Safety Officer job) that the Hospital offered McKever.  (Id. at p. 193.)  Thus, the Court considers only the OR Tech Support position in its "lateral transfer" analysis.

[9]  There is no evidence that the Safety Officer position had any similar on-call requirements.

overlooks the factual dispute regarding the drastic change in job role and responsibilities between the two positions. Though McKever declined the OR Support Tech job offer, that offer was for a materially different position with different responsibilities, which cuts against treating it as a lateral transfer. See Obester v. Lucas Assocs., Inc., No. 1:08-CV-03491-MHS-AJB, 2010 WL 8292401, at *37 (N.D. Ga. Aug. 2, 2010) ("Obester has presented evidence sufficient with which to withstand summary judgment as to whether the elimination of her position was an adverse employment action, *even assuming that Obester voluntarily resigned after declining the offer of the position of Corporate Recruiter*. . . . [I]t is undisputed that Obester would have received the same or better pay and benefits as other Corporate Recruiters if she had accepted the position. In addition, it appears that Obester would have received virtually the same base salary she received as a Corporate Services Manager and would have received substantially the same benefits . . . . However, it is also undisputed that Obester's duties would be significantly different, if not completely, different from her duties as a Corporate Services Manager.") (emphasis added). Therefore, the Court cannot conclude on summary judgment that the OR Scrub Tech position was a "lateral transfer" from the Safety Officer role that did not involve a significant change in position or job duties. See Vinson v. Koch Foods of Ala., LLC, 735 F. App'x 978, 980 (11th Cir. 2018) ("Vinson presented evidence that her transfer moved her out of the HR office to the refrigerated production floor. She lost her computer access and her office. Her duties now included pulling guts from chicken carcasses, sawing chicken carcasses, hanging dead chickens on shackles, cutting and removing damaged meat from chicken carcasses, using sealing machines for packaging, and weight boxes of meat. This was a significant change in duties."); Holland v. Gee, 677 F.3d 1047, 1058 (11th Cir. 2012) (affirming the jury's finding that a transfer constituted an adverse action because there was sufficient evidence that "the transfer was a permanent reassignment with

*significantly* different duties.") (internal quotations omitted); compare Shaw v. Mobile Cnty. Public Sch. Sys., 84 F. Supp. 3d 1303, 1313 (S.D. Ala. 2015) (finding that "a jury could reasonably conclude that the failure to hire or transfer an employee from physical education to driver's education would have been materially adverse to a reasonable employee" when the new job involved "a change of duties and responsibilities" as well as a change of "job classification"), with Davis v. City of Loganville, No. 3:04-CV-068 (CAR), 2006 WL 8445881, at *10 (M.D. Ga. Mar. 28, 2006) ("It is undisputed that Durden receives the same amount of compensation for the job he performs, retains the same rank and title, and job duties.  In fact, the only thing that has changed with respect to Durden's position is the location. . . .  Because Durden cannot establish that the decision to transfer him to a different location was an adverse employment action, he has failed to make out a prima facie case of retaliation."), and Crayton v. Ala. Dep't of Agric. & Indus., 589 F. Supp. 2d 1266, 1284–85 (M.D. Ala. Dec. 18, 2008) ("[T]he transfer was apples and apples, a lateral career move.  Crayton received the same salary and the same benefits.  He retained the same ranking and a title of identical important.  He had comparable duties.").[10]

Based on the foregoing, the Court finds that an issue of material fact exists as to whether McKever suffered an adverse employment action.  Accordingly, the Hospital is not entitled to summary judgment on this element.

---

[10]  The Hospital also appears to argue that McKever did not suffer an adverse employment action because the Hospital offered McKever the Safety Officer position after this lawsuit was filed.  (Doc. 63, p. 23.)  For support, the Hospital cites to the Rule 26(f) Report from this case.  (Id. (citing doc. 46-29).)  While the Rule 26(f) Report states that the Hospital "offered jobs to . . . McKever, including security guard jobs," the Report also states that Plaintiff "is unaware of any unconditional offers of employment that have been made post-lawsuit filing."  (Doc. 46-29, p. 6.)  Considering the Hospital has not pointed to any other record evidence indicating that it offered McKever a Security Officer position post-lawsuit filing, a question of fact remains as to whether it indeed did so.

**IV.     Whether the Hospital Took the Adverse Employment Action Because of McKever's Disability**

To establish that an employer intentionally discriminated against an applicant in violation of the ADA, the plaintiff "may rely on direct or circumstantial evidence." Carper v. TWC Servs., Inc., 820 F. Supp. 2d 1339, 1347 (S.D. Fla. 2011). "[T]he type of evidence before the court affects the allocation of evidentiary burdens." Id. Absent direct evidence of discrimination, a plaintiff must establish a prima facie case of intentional discrimination in violation of the ADA through circumstantial evidence using the burden-shifting analysis set out in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973).[11] See Wascura v. City of S. Miami, 257 F.3d 1238, 1242 (11th Cir. 2001). If the plaintiff makes the prima facie showing, then the burden shifts to the employer to "'articulate a legitimate, non-discriminatory reason' for the challenged action." Connelly v. WellStar Health Sys., Inc., 758 F. App'x 825, 828 (11th Cir. 2019) (quoting Wascura, 257 F.3d at 1242). If the employer does so, the burden then shifts back to the employee to show that the employer's proffered reason is mere pretext. Id.

In contrast, if direct evidence of discrimination exists, "the familiar framework of establishing a *prima facie* case based on circumstantial evidence and the alternating burdens of proof established by McDonnell Douglas . . . do not apply." Schultz, 465 F. Supp. 3d at 1263. Indeed, "when a case for discrimination is proved by direct evidence, it is incorrect to rely on a McDonnell Douglas form of rebuttal." Id. Instead, when direct evidence of discrimination exists, "an unconstitutional motive has been deemed to have been a determinative factor in an

---

[11]  Although the McDonnell Douglas framework originated in the Title VII context, the Eleventh Circuit has since utilized it to analyze claims arising under the ADA. See, e.g., Cleveland v. Home Shopping Network, Inc., 369 F.3d 1189, 1193 (11th Cir. 2004) (ADA case decided using McDonnell Douglas framework).

employment decision, and the burden is on the defendant to prove by a preponderance of the evidence that the same decision would have been reached even absent the discriminatory motive." Carper, 820 F. Supp. 2d at 1347. "[A] finding that direct evidence of discrimination exists, standing alone, is normally sufficient to defeat a motion for summary judgment." Id.

Direct evidence is "[e]vidence, which if believed, proves existence of fact in issue without inference or presumption." Rollins v. TechSouth, Inc., 833 F.2d 1525, 1528 n.6 (11th Cir. 1987) (emphasis omitted). In other words, direct evidence is evidence that "establishes the existence of discriminatory intent behind the employment decision without any inference or presumption." E.E.O.C. v. Joe's Stone Crab, Inc., 220 F.3d 1263, 1286 (11th Cir. 2000). On the other hand, "evidence that only suggests discrimination or that is subject to more than one interpretation does not constitute direct evidence." Schultz, 465 F. Supp. 3d at 1263 (internal citations omitted). Indeed, "only the most blatant remarks, whose intent could mean nothing other than to discriminate on the basis of" some impermissible factor constitutes direct evidence of discrimination. Rojas v. Florida, 285 F.3d 1339, 1342 n.2 (11th Cir. 2002). "For example, in an ADA case, a decisionmaker's blanket statement that people with a certain disability are not competent to perform a particular job would amount to direct evidence of discrimination." Bennett v. Brookdale Senior Living, Inc., No. 2:09-cv-1723-SLB, 2011 WL 13285770, at *7 (N.D. Ala. Sept. 14, 2011) (citing Haynes v. W.C. Caye & Co., Inc., 52 F.3d 928, 931 (11th Cir. 1995); see also Merritt v. Dillard Paper Co., 120 F.3d 1181, 1189–90 (11th Cir. 1997) (listing cases where Eleventh Circuit found direct evidence of race and sex discrimination existed in employment context and quoting the statements found to be direct evidence).

Here, the parties dispute whether this case is a "direct evidence case" or a "circumstantial evidence case." (Doc. 53, p. 11; doc. 63, pp. 2–6.) The EEOC argues that this is a direct evidence

case because "[t]here is no dispute that McKever has HIV, that the decisionmaker, Floyd, knew he had HIV, and that Floyd rescinded the job offer to McKever because she believed his HIV-positive status created a safety risk working in the Safety Officer position." (Doc 53, p. 11.) The Hospital argues that this is a circumstantial evidence case because "there is no evidence of discriminatory motive." (Doc. 63, p. 2.) The Hospital contends that, to the contrary, "Floyd concluded that McKever's employment in a Safety/Security Officer position at that time would pose a safety issue, but that there were numerous other positions that [McKever] could perform." (Id. at pp. 2–3.) The Hospital further elaborates that Floyd's conclusion "reflects a concern that McKever's condition would prevent him from performing certain requirements of the job" and that Floyd's "statements do not reflect the blatant discriminatory animus required for this to be a direct evidence case." (Id. at p. 4.)

Admittedly, "[t]his is an odd and difficult case due to the fact that the direct evidence of discriminatory attitude is inextricably intertwined with" Floyd's concerns about McKever's ability to safely perform the Safety Officer role. Jordan v. City of Union City, 94 F. Supp. 3d 1328, 1338 n.3 (N.D. Ga. 2015). Indeed, the Hospital does not dispute that Floyd revoked McKever's job offer due to McKever's HIV-positive status. In fact, the Hospital admits that McKever's HIV-positive status was the only reason Floyd revoked the job. (See doc. 55-1, p. 23.) The Hospital essentially contends that Floyd's decision to revoke McKever's job offer due to McKever's disability was justified because Floyd believed McKever could pose a safety risk. However, the Hospital "cannot eat its cake and have it, too." Jordan, 94 F. Supp. 3d at 1338 n.3. At this stage in the analysis, Floyd's verbalization that she revoked McKever's job offer due to his HIV-positive status could constitute direct evidence of discriminatory attitude. See id. ("The undisputed evidence shows Tate considered Plaintiff's anxiety condition when terminating him. At this step

in the analysis, Tate's verbalization of that consideration equates to direct evidence of discriminatory attitude."); see also Equal Emp. Opportunity Comm'n v. Dolgencorp, LLC, No. 6:17-cv-100, 2018 WL 6251379, at *6 (S.D. Ga. Nov. 29, 2018) ("Williams told Mosley she could not work at Defendant's store 'because of her arm.'  Later, Williams referred to Mosely as 'the woman with the messed up arm, . . . stated she would not have set up an interview had she known about Moseley's arm, and went on to say that she would never hire Mosley. . . . *Either statement alone* is sufficient to raise a triable issue as to whether Mosley was denied employment because of her disability.") (emphasis added); Henson v. City of Atlanta, No. 1:17-cv-03024-JPB-RGV, 2019 WL 12426046, at *12 (N.D. Ga. June 18, 2019) ("Chief Cochran allegedly informed Henson during the meeting that he considered him to be mentally impaired and that he was therefore required to engage in psychological counseling as part of the recommended EAP program, but that since he failed to comply with that requirement, he was being demoted, removed from the Captain eligibility list, and placed on a PIP.  Thus, Chief Cochran's statements are sufficient to raise a triable issue as to whether [Henson suffered an adverse action] because of [his perceived] disability.") (internal quotations omitted), *report & recommendation adopted by* No. 1:17-CV-03024-JPB, 2020 WL 10147071, at *5 (N.D. Ga. Mar. 4, 2020) ("Plaintiff's uncontroverted evidence showed that Fire Chief Cochran stated that he was demoting Plaintiff because he was mentally impaired.  As such, Plaintiff did present direct evidence of discrimination, and thus Plaintiff raises a triable issue as to whether he was demoted because of his disability.").

The Hospital also argues that Plaintiff failed to establish that its proffered reasons for revoking the conditional job offer were mere pretext.  (Doc. 47, pp. 22–25.)  However, because Plaintiff presented direct evidence of discrimination, the Court need not address the Hospital's arguments regarding the McDonnell Douglas burden shifting framework.  Dolgencorp, LLC, 2018

WL 6251379, at *6 ("Because there is direct evidence of discrimination, the Court need not address the parties' arguments regarding the <u>McDonnell Douglas</u> burden shifting framework."). Accordingly, neither the Hospital nor the EEOC is entitled to summary judgment on this element. Thus, the Court **DENIES** Plaintiff's Motion for Partial Summary Judgment, (doc. 37), and Defendant's Motion for Summary Judgment, (doc. 46), on this issue.

## CONCLUSION

Based on the foregoing, the Court **DENIES** Defendant St. Joseph's/Candler Health System's Motion for Summary Judgment.  (Doc. 46.)  The Court also **GRANTS in part** and **DENIES in part** Plaintiff EEOC's Motion for Partial Summary Judgment.  (Doc. 37.) Specifically, the Court **GRANTS** Plaintiff EEOC's Motion for Partial Summary Judgment on the issues of whether McKever was disabled and whether McKever satisfied the prerequisites of the Safety Officer position.  (<u>Id.</u>)  However, the Court **DENIES** Plaintiff EEOC's Motion for Partial Summary Judgment on the issues of whether McKever would pose a direct threat (including whether the Hospital based its decision to revoke McKever's job offer on an individualized assessment and current, objective medical evidence) and whether the Hospital rescinded the conditional job offer for the Safety Officer position because of McKever's disability.  (<u>Id.</u>)

**SO ORDERED**, this 3rd day of March, 2022.

_____
R. STAN BAKER
UNITED STATES DISTRICT JUDGE
SOUTHERN DISTRICT OF GEORGIA